**Dated: December 16, 2024**

**The following is ORDERED:**



Sarah A Hall
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| AMY LIEBL DARTER, MD, PC, | ) | Case No. 23-11680-SAH |
| | ) | |
| Debtor. | ) | |
| —————————————————— | ) | |
| | ) | |
| DOUGLAS N. GOULD, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. 23-01057-SAH |
| | ) | |
| AMY LIEBL-WEAVER, KT WEAVER, | ) | |
| AAA SISTERS, LLC, and KT WEAVER | ) | |
| CONSTRUCTION, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On July 29 and 30, 2024, the following matters came on for trial in the above-captioned

adversary proceeding:

1.      Verified Complaint [Doc. 1], filed by Douglas N. Gould, chapter 7 trustee ("Trustee") in the above captioned bankruptcy case (the "Bankruptcy Case"), on November 29, 2023;

2.      Amended Answer to Adversary Complaint [Doc. 25], filed by defendants Amy Liebl-Weaver ("Liebl-Weaver"), KT Weaver ("KT Weaver"), AAA Sisters, LLC ("AAA Sisters"), and KT Weaver Construction, LLC ("KT Weaver Construction"; Liebl-Weaver, KT Weaver, AAA Sisters, and KT Weaver Construction, collectively "Defendants") on January 8, 2024; and

3.      Final Pretrial Order [Doc. 44], entered on July 22, 2024.

Trustee appeared in person and through counsel, Jerry D. Brown; and Defendants appeared in person and through counsel, Jeffrey S. Coe.  After the trial concluded, Trustee and Defendants filed Proposed Findings of Fact and Conclusions of Law [Docs. 56 and 57, respectively] on October 15, 2024.

## JURISDICTION

The Court has jurisdiction to hear the trial of this matter pursuant to 28 U.S.C. § 1334(b), and venue is proper pursuant to 28 U.S.C. § 1409.  Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a), and this is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(H).  Additionally, the parties have consented to this Court's entry of final orders pursuant to Federal Rules of Bankruptcy Procedure 7008 and 7012.

## INTRODUCTION

At conclusion of the trial, and now again after carefully reviewing and considering the testimony and evidence presented at trial, the Court is perplexed by the demise of debtor, Amy Liebl Darter, MD, PC ("Debtor"), and the explanation provided therefor by Liebl-Weaver

and KT Weaver.  As late as the summer of 2022, Debtor was an economically viable and successful medical practice, managed by Liebl-Weaver.  Less than a year later, after Debtor was struck by alleged employee wrongdoing and a cybersecurity attack, Liebl-Weaver lost her medical license, Debtor filed a chapter 7 bankruptcy petition, and minimal assets were available for distribution to creditors.  In the year during which all of these calamities struck, Liebl-Weaver, KT Weaver, and KT Weaver Construction received a combined $818,739.67 from Debtor, a disturbing fact leading Trustee to commence this adversary proceeding.

Blame for Debtor's ultimate demise is cast by Liebl-Weaver and KT Weaver on a far-fetched tale of identity theft, employee theft and wrongdoing, and an "acute" cybersecurity attack for which there is no reliable evidence.  Their testimony seems particularly incredible when juxtaposed with their complete inaction to recover from these catastrophes.  And, conveniently, the cybersecurity attack left them without any electronic records from which the details of the services Liebl-Weaver, KT Weaver, and KT Weaver Construction allegedly provided to Debtor could be ascertained.  Moreover, the cybersecurity attack somehow resulted in Defendants' paper records and files being in complete shambles and essentially worthless to the Trustee.

For reasons stated below, the Court simply cannot accept Liebl-Weaver's and KT Weaver's dubious explanations for why Liebl-Weaver, KT Weaver, and KT Weaver Construction deliberately and intentionally drained the available cash from Debtor prior to its bankruptcy filing.  The most telling flaw in their explanation for the demise of Debtor is Liebl-Weaver's apparent failure to take the necessary steps to regain access to Debtor's computer system, specifically Debtor's medical records, be it through legal and/or computer experts engaged near the time of the cybersecurity attack.  Moreover, rather than preserve the medical business,

Liebl-Weaver allowed KT Weaver and KT Weaver Construction to continue to make costly improvements to Debtor's office building at great expense to Debtor (despite the building being owned by AAA Sisters). The Court will never understand why Liebl-Weaver allowed this to unfold, but she did, and effectively stripped all cash from Debtor and directed it into her pockets and those of her husband, and his entity.

### FINDINGS OF FACT

This constitutes the Court's findings of fact as necessary under Federal Rule of Civil Procedure 52 (applicable pursuant to Federal Rule of Bankruptcy Procedure 7052). Any findings of fact herein are also deemed, to the extent appropriate, to be conclusions of law, and vice versa.

### Background

1. Liebl-Weaver is an individual who formerly held a license to practice medicine in the State of Oklahoma.

2. Liebl-Weaver formed Amy Liebl Darter, M.D. P.C. as a Professional Corporation in Oklahoma on March 18, 1999.

3. Liebl-Weaver began practicing medicine in Oklahoma in the late 1990's and practiced medicine for over 20 years – almost exclusively through Debtor. Based on the evidence presented, Debtor was extremely successful and profitable until 2023.

4. Liebl-Weaver was employed by Debtor and initially had a contract with Debtor for employment, but it was never updated or presented as evidence.

5. Per Liebl-Weaver, her salary from Debtor was $600,000 annually, paid every two weeks before the alleged cybersecurity attack.

### KT Weaver and KT Weaver Construction

6. KT Weaver is an individual with an extensive background in construction.

7.    KT Weaver is the sole owner of KT Weaver Construction which was formed in 2021. Per KT Weaver, KT Weaver Construction performed work for Debtor and "others."[1]

8.    KT Weaver Construction began working for Debtor in 2021.  No written contract evidencing the terms between Debtor and KT Weaver Construction exists.

9.    If services were performed by KT Weaver Construction,[2] it submitted an invoice[3] for services to Debtor, and Debtor paid.[4]

10.    Admittedly, invoices were not always submitted for work by KT Weaver Construction, but Debtor paid nevertheless.[5]  In fact, none of the payments made by Debtor to

---

[1] Once Debtor ceased operations, KT Weaver Construction had only nominal deposits other than transfers from other accounts, suggesting no other customers.  Further, KT Weaver Construction had no income in 2024 until the summer due to KT Weaver having shoulder surgery and needing to recover.

[2] Liebl-Weaver testified one reason for the construction work done by KT Weaver Construction was the closing of two satellite offices (located in Norman and Yukon) in December 2022 due to staffing issues.  But she also testified the Norman office did not close until March 1, 2023. Liebl-Weaver further testified construction was required to provide accommodation for infusion patients.

[3] At some point after it started work for Debtor, KT Weaver Construction switched from manual invoices to Home Invoice to generate invoices but followed the same process – invoices reflecting work done were submitted to Debtor, then were reviewed and paid by Debtor.

[4] At trial, KT Weaver Construction provided only five invoices issued to Debtor and six invoices issued to third parties, either dated 2021 or undated.  (Defendants Exs. 8 and 9).  The invoices for Debtor are for relatively nominal amounts in relation to the bulk of the transfers made by Debtor to KT Weaver Construction, ranging from only $350.00 to $4,300.00.  (Defendants Ex. 8).  The invoices to third parties were also relatively small in comparison to the transfers made to KT Weaver Construction from Debtor, ranging from $2,300.00 to $9,400.00.  (Defendants Ex. 9). Neither Defendants Exhibits 8 or 9 bear any relation to the generally larger "invoiced" amounts paid by Debtor to KT Weaver Construction in later 2022 and 2023 and only serve to underscore the extraordinariness of such payments.

[5] KT Weaver Construction did present a "stack" of unorganized third-party receipts as support for the amounts paid by Debtor to it in 2022 and 2023, the bulk of which were not notated in any manner as being for the benefit of Debtor.  (Defendants Ex. 5).  Moreover, KT Weaver testified

KT Weaver Construction in 2022 and 2023, which are subject to Trustee's claims for avoidance, are evidenced by an invoice.

11.  In the summer of 2022, likely July 2022, Debtor hired KT Weaver to oversee[6] payroll (employee benefits, time off, etc.), but no bookkeeping, at a starting salary of over $72,800.00 annually, paid bi-weekly.[7]  His duties as Debtor's employee were in addition to his obligations as a construction contractor for Debtor.  KT Weaver remained an employee of Debtor until it closed in June 2023.[8]  (Defendants Ex. 19).

12.  As Debtor's employee, KT Weaver also ran errands, did repairs, and arranged for repairs (which is also within the scope of KT Weaver Construction's work).

13.  There is no contract covering KT Weaver's employment by Debtor or setting the terms of his employment.

---

several were not for Debtor, and a review of Defendants Exhibit 5 reveals a number are clearly associated with other jobs and not Debtor.  While Defendants attempted to allocate the invoices to checks issued by Debtor to KT Weaver Construction, such evidence is woefully insufficient to establish the extent, scope, or benefit of services provided by KT Weaver Construction to Debtor.

[6] KT Weaver received employees' timesheets, reviewed them, and transmitted them to the payroll provider.

[7] Both Liebl-Weaver and KT Weaver testified his annual salary from Debtor was approximately $60,000.00.  However, per Debtor's payroll records, KT Weaver was paid $2,800.00 each biweekly pay period which amounts to $72,800.00 per year, an amount $12,800.00 more than their testimony.  (Defendants Ex. 19).

[8] Although neither Liebl-Weaver nor KT Weaver testified KT Weaver was a full-time employee of Debtor, Debtor's payroll suggests he was.  In Defendants Exhibit 19, KT Weaver is classified as an "officer" and, out of 31 employees, only seven (including Liebl-Weaver) earned a higher salary than he did.

14. Notwithstanding KT Weaver's employment by Debtor, KT Weaver Construction continued to perform work for Debtor and, in fact, received increasingly greater payments from Debtor.

15. KT Weaver never authorized checks for Debtor.

16. Liebl-Weaver and KT Weaver were married on February 28, 2023. KT Weaver stated he was financially stable and had his own money when he married. Bank statements for KT Weaver Construction reflect steady income leading up to the marriage. (Plaintiff Ex. 23).

### AAA Sisters

17. Liebl-Weaver formed AAA Sisters, a Limited Liability Company, on November 12, 2008.

18. Liebl-Weaver owns 98.5% of AAA Sisters (with her three daughters equally sharing the remaining 1.5%).

19. AAA Sisters owned certain real property and premises located at 1810 E. Memorial Road, Oklahoma City, Oklahoma, in which Debtor operated her medical practice until 2023 (the "Real Property").

20. Per Liebl-Weaver, a written lease between Debtor and AAA Sisters respecting the Real Property existed in 2009 but she does not know if it was ever "updated." The terms of the lease were not provided, and no one testified regarding monthly rent or the respective obligations of AAA Sisters and Debtor thereunder.

21. AAA Sisters is not a creditor of Debtor; all rent has been paid from Debtor to AAA Sisters. However, Debtor's Statement of Financial Affairs (and subsequent amended Statements of Financial Affairs) reflect no rent payments were made to AAA Sisters from November 2023 to June 2024. (Bankruptcy Case Docs. 10, 16, 46, 70).[9]

---

[9] It is well established that a court may take judicial notice of its own records as well as

22.    Per Liebl-Weaver, under the unwritten lease, Debtor, as lessee, was responsible for all improvements necessary for patient care.[10]

23.    AAA Sisters sold the Real Property for $3.5 million on December 22, 2023. Liebl-Weaver believes this was the market value for the Real Property.[11]

### Fall 2022 Identity Theft and Employee Fraud and Wrongdoing

24.    In the fall of 2022, KT Weaver thought he lost his ID but then realized a month later it had been stolen. KT Weaver cancelled his credit cards and contacted the Federal Bureau of Investigation (the "FBI") regarding charges on his credit but never filed a police report. KT Weaver believes his ID theft is linked to Debtor's alleged employee fraud.

25.    Also in the fall of 2022 per Liebl-Weaver and KT Weaver, Debtor had an employee or employees who allegedly opened fraudulent accounts with vendors to which payments on real accounts were allegedly diverted. Liebl-Weaver claims police reports were filed but produced no such reports. Additionally, no fraudulent activity was identified in the bank

---

records of other courts, particularly in closely related cases. Hutchinson v. Hahn, 402 F. App'x 391, 394-95 (10th Cir. 2010) (citing St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1172 (10th Cir. 1979)); Cornforth v. Fidelity Inv., 2017 WL 650132 (W.D. Okla. 2017).

[10] This was but one of the times either Liebl-Weaver or KT Weaver suggested a given practice of Debtor was pursuant to "standard" practices in the relevant industry. It is not lost on the Court that the only witnesses to discuss standard practices in the relevant industries (as this Court sees it, medicine, commercial real estate, and construction) were Liebl-Weaver and KT Weaver – not one third party witness confirmed these "standard" practices which seem far abreast from what the Court has seen as standard industry practices in the medical, commercial real estate, and construction industries and further appear to be sloppy, inadequate, and grossly unfair to Debtor while benefitting AAA Sisters, which exclusively reaped the benefits when it sold the Real Property in late 2023.

[11] Trustee unsuccessfully took immediate action when filing this adversary proceeding in an effort to enjoin AAA Sisters and Defendants from dissipating the sale proceeds. His quest to move quickly thereafter likely caused him to focus on the need for a speedy trial and lose sight of the need to prove insolvency under Section 548(a)(1)(B).

account statements despite extensive examination and cross-examination over the bank account statements.

26.   Liebl-Weaver testified, in October or November 2022, Debtor started a forensic investigation into Debtor's computer system with Great White Bison as the experts.  The Court notes this conflicts with KT Weaver's testimony and the documentary evidence which shows Great White Bison was first contacted in September 2023.  (Defendant's Ex. 10).

27.   Both the identity theft and the employee fraud claim appear to be red herrings designed to justify the absence of any usable financial records (other than bank records) to support the transfers made by Debtor to Liebl-Weaver, KT Weaver, and KT Weaver Construction in late 2022 and 2023 and force acceptance of their verbal account of the transactions.

28.   On November 17, 2022, KT Weaver Construction made a $50,000.00 wire transfer (later reimbursed by Debtor) to the law firm of Box & Box for representation in speaking to the FBI regarding cybersecurity issues per Liebl-Weaver.  However, KT Weaver testified he spoke with the FBI because his identity had been stolen.[12]  Liebl-Weaver later testified Debtor hired Box & Box because of the employee fraud.  Both Liebl-Weaver and KT Weaver claimed they needed representation in meeting with the FBI as victims.

---

[12] See Defendants Exhibit 16 – a receipt dated April 5, 2023, by Box & Box for its receipt from the FBI for return of one 500 GB portable solid-state drive and one Lenovo desktop computer.

**Transfers**[13]

29.    On July 8, 2022, Debtor transferred $7,762.55[14] to KT Weaver for outdoor lighting.[15]

30.    On July 20, 2022, Debtor transferred $5,698.87 to KT Weaver Construction for outdoor lighting, equipment rental, and wiring.

31.    On August 4, 2022, Debtor transferred $9,818.80 to KT Weaver Construction for repairs on several buildings.

32.    On August 17, 2022, Debtor transferred $8,218.00 to KT Weaver Construction for construction.

33.    On September 13, 2022, Debtor transferred $699.00 to KT Weaver Construction for a new dishwasher.  However, the Court notes KT Weaver Construction did not purchase a dishwasher until September 20, 2022, rendering this testimony false.  (Defendants Ex. 5, p. 41).

34.    On October 7, 2022, Debtor transferred $8,275.00 to KT Weaver Construction for building repair.

---

[13] Interestingly, Liebl-Weaver had relatively clear memories of projects done by KT Weaver and KT Weaver Construction in mid-2022 but noticeably less for more recent transfers made, often having no idea what work KT Weaver Construction performed.  This strikes the Court as contrived given the amount paid to KT Weaver Construction in the year preceding the bankruptcy filing.

[14] Although the Final Pretrial Order indicated this transfer was for $7,790.50, documentary evidence reflects the transfer amount was $7,762.55.  (Plaintiff Ex. 14, p. 12).

[15] KT Weaver Construction provided 195 pages of receipts from third parties to KT Weaver for supplies and services allegedly provided to Debtor, some of which are illegible, and others are admittedly not for Debtor.  (Defendants Ex. 5, pp. 4, 106, 118, 199 and 120).  Frankly, although KT Weaver testified in painstaking detail for most of the receipts, it is impossible to reconcile such clear memories with his earlier unclear testimony about his inability to remember deposits into bank accounts, even when most of the receipts have no designation they are for Debtor's benefit.  Additionally, the Court found a number of receipts with clear indications they were for other jobs and not Debtor.  (Defendants Ex. 5, pp. 46, 73, 107, 108, 119, 120, 123, and 165).

35.    On October 21, 2022, Debtor transferred $17,230.00 to KT Weaver Construction, but neither Liebl-Weaver nor KT Weaver recalled why the money was transferred.

36.    On November 7, 2022, Debtor transferred $9,320.00 to KT Weaver Construction for construction and lighting.

37.    On November 16, 2022,[16] Debtor transferred $42,048.22 to KT Weaver Construction for consulting and demolition for an infusion suite.

38.    On November 16, 2022, Debtor transferred $60,031.00 to KT Weaver Construction for construction such as drywall, paint, electrical, and concrete.

39.    On November 21, 2022, Debor transferred $15,872.97 to Liebl-Weaver for her salary.

40.    On December 5, 2022, Debtor transferred $75,000.00 to KT Weaver Construction. Liebl-Weaver testified $25,000.00 was reimbursement for construction cost (but could not identify any projects) and $50,000.00 was reimbursement for the retainer paid to Box & Box to represent them in talking to the FBI about the cybersecurity attack.  This conflicts with KT Weaver's testimony that this check was a reimbursement for construction expenses such as HVAC and lighting, and a reimbursement for medication he purchased for Debtor.  It further conflicts with KT Weaver's later testimony that the retainer to Box & Box was paid in relation to his stolen identity and discussions with the FBI.  By all accounts, the cybersecurity attack on Debtor did not happen until late February 2023, rendering Liebl-Weaver's and KT Weaver's testimony incorrect at best.

41.    On December 14, 2022, Debtor paid $14,846.53 to Liebl-Weaver for her salary.

---

[16] Although the Final Pretrial Order indicated this transfer occurred on November 1, 2022, the testimony and documentary evidence reflect the transfer was made November 16, 2022. (Plaintiff Ex. 14, p. 23).

42.   On December 14, 2022, Debtor transferred $4,638.51 to KT Weaver which Liebl-Weaver testified was a manual payroll check for salary and a Christmas bonus.

43.   On December 14, 2022, Debtor transferred $37,225.00 to KT Weaver Construction, which Liebl-Weaver and KT Weaver claimed did not go through; the bank statement proves otherwise.  (Plaintiff Ex. 12, p. 5).

44.   On December 23, 2022, Debtor transferred $2,138.65 to KT Weaver for payroll.

45.   On December 28, 2022, Debtor transferred $15,872.97 to Liebl-Weaver for payroll.

46.   On December 29, 2022, Debtor transferred $28,000.00 to Liebl-Weaver for a management fee from an active research LLC pursuant to which she was to receive $6,000.00 per quarter (she could not explain the extra $4,000.00).  No contract exists between Debtor and the research LLC, no formation documents or other documentation was offered into evidence suggesting it was operating and doing work for Debtor, and no invoices and or any other credible evidence supports the payment.

47.   On January 3, 2023, Debtor transferred $45,334.99 to Liebl-Weaver pursuant to a check dated December 30, 2022, for unused vacation as she took none in 2022 (per her testimony, she did not take vacation due to problems at Debtor including the cybersecurity event which did not happen until late February 2023).  Given her salary, this means she had six weeks of vacation per year.

48.   On January 25, 2023, Debtor transferred $7,744.00 to Liebl-Weaver to reimburse a loan payment but she could provide no further specifics or any evidence to support her testimony.

49.    On February 15, 2023, Debtor transferred $75,000.00 to KT Weaver Construction to reimburse him for medication he purchased in Dallas for Debtor.[17]

50.    On February 16, 2023, Debtor transferred $6,000.00 to Liebl-Weaver for the quarterly management fee for the research LLC.  Liebl-Weaver provided no credible evidentiary support.

51.    On February 17, 2023, Debtor transferred $6,377.49 to KT Weaver Construction as reimbursement for office supplies, paint, and construction costs per Weaver.

**Acute Cybersecurity Event**

52.    Something happened to Debtor's computer system in late February 2023, however, what occurred the Court still does not know.  According to Liebl-Weaver (and her testimony conflicts at times with KT Weaver's testimony), the cybersecurity attack started with KT Weaver losing access to his iPhone in the fall of 2022, which Apple could not explain, and then Liebl-Weaver lost her phone access.[18]

53.    Liebl-Weaver testified, about a week later (an improbable timeframe) Debtor could no longer access its medical files because the company who managed Debtor's patient records, Meditab, quit interacting with her and Debtor.  Liebl-Weaver claims Meditab refused to grant access, but she could see their security allowed third party access.

54.    Liebl-Weaver testified Meditab sent a "ransom" request to Debtor for $25,000.00 although no corroborating evidence was presented.  The Court believes it is more likely

---

[17] On January 10, 2023, Debtor purchased a medication, Xolair, from William Lumry in Dallas that could not be ordered online.  Liebl-Weaver forgot her checkbook when she picked up the medication in Dallas, so KT Weaver paid for it, and she reimbursed him.  (See Defendants Ex. 17).

[18] Liebl-Weaver later testified she could not state the employee wrongdoing and fraud in 2022 and the cyberattack in 2023 were related.

the "ransom" was a legitimate request for payment; however, Liebl-Weaver testified her

attorney advised Debtor should not pay Meditab, so Debtor continued to be unable to

access its records.

55.    Since Debtor could not access patient files, it was forced to cancel appointments.

56.    After the cybersecurity event, in March 2023, Debtor bought new Apple computers and

products and scrapped the old computers[19] in an effort to start anew and work.  After

setting up the new equipment, access was available but new emails were then

compromised.

57.    According to Defendants, the cybersecurity event also impacted the medical building's

hardwiring which could not be fixed.

58.    Per KT Weaver, the cybersecurity event also affected all of his electronic information so

he and KT Weaver Construction could no longer prepare invoices on Home Invoice or

access past invoices on Home Invoice.  KT Weaver testified he asked for a password reset

from Home Invoice but it could only be pushed to his old email address affected by the

cybersecurity event.  Consequently, the password could not be changed via email, and no

other way to reset the password existed.

59.    As a result of the cybersecurity event, Debtor excused any invoice requirement (which

had not, in any event, been enforced in 2022 and 2023) for KT Weaver Construction and

advised it only needed to provide receipts.  The problem with this claim is no invoices

were provided to the Court for any of the work done by KT Weaver or KT Weaver

Construction in either 2022 or 2023, with the bulk of such timeframe occurring prior to

---

[19] KT Weaver paid for the new Apple equipment and was reimbursed by Debtor.  (Plaintiff
Ex. 27) (proof of purchase).

the cybersecurity event.  The last dated KT Weaver Construction invoice to Debtor is from 2021.[20]

60.    The only evidence of the cybersecurity attack beyond the testimony of Liebl-Weaver and KT Weaver is two short documents authored by Great White Bison.[21]  (Defendants Ex. 10).  In September 2023, ***seven months after the original cybersecurity event***, KT Weaver and Liebl-Weaver hired Great White Bison.

61.    The January 2, 2024, Great White Bison statement on the ***initial*** September 2023 meeting with Defendants does not indicate Great White Bison analyzed Debtor's computers and systems.  Rather, it merely reflects Defendants provided them with (i) a bitlocker received from Meditab containing the medical records which remained inaccessible, and (ii) a list of IP addresses that accessed Debtor's Meditab account, many of which are foreign.  (Defendants Ex. 10, p. 1)

62.    In a memorandum dated June 16, 2024, Great White Bison stated Liebl-Weaver provided screenshots from iPhones showing the message "bug_type : 313" which Great White Bison stated "could be" a multi-device management configuration.  However, Great White Bison clearly stated it never handled or diagnosed the phones or computer system. (Defendants Ex. 10, p. 2).

---

[20] Per Liebl-Weaver, any payroll check received by KT Weaver after the late February 2023 cybersecurity event was earned because she was seeing lots of patients.  This is an interesting comment since he did payroll, not patient care, and no basis was provided why seeing a lot of patients increased his workload in any fashion (and she never testified she terminated staff prior to closing her practice so presumably everyone was doing their respective jobs).

[21] The statements are clearly hearsay but were admitted.  The statements do little to corroborate the tale told by Defendants other than to identify the date Defendants sought help with their cybersecurity event – a date seven months later, which this Court finds is hardly consistent with any effort to preserve Debtor and obtain access to its critical medical files.

63.    Although a Great White Bison employee was listed on Defendants' witness and exhibit list, no one appeared and testified.

64.    Liebl-Weaver testified she reported the cybersecurity event to the Federal Trade Commission, FBI, the Oklahoma Attorney General and the Internal Revenue Service, yet she provided no corroborating evidence whatsoever any report was made.

65.    Trustee testified the computers were not locked or inaccessible but rather were wiped clean.

66.    Debtor was insured and is willing to cooperate with Trustee to make claims against its insurance.  Liebl-Weaver suggested claims were made but her health, the bankruptcy, and her medical board issues required it to be placed on the back burner.

67.    After the cybersecurity event, Liebl-Weaver continued to see patients but could not see new or sick patients, only those with chronic care needs since they remained unable to access medical files.

68.    Eventually, Debtor had no choice but to shut down as it could not bill insurance because it had no computer access.

69.    Liebl-Weaver testified Debtor provided "free service" for 4 months until June 2023, giving allergy shots and doing nursing work.[22]

---

[22] Payroll was paid to employees normally until late May.  Per Liebl-Weaver, she and her employees were working 6-7 days a week all while only being able to provide treatments since they had no access to the medical files.  This makes no sense – if Debtor could only provide a fraction of the medical services it normally provided, and could not bill those services, why would employees have to work even longer hours?

### More Transfers

70.    On March 17, 2023, Debtor transferred $11,600.00 to KT Weaver as reimbursement for his purchase of Apple iPads and computers for the medical practice.

71.    On April 3, 2023, Debtor transferred $13,722.89 to Liebl-Weaver for payroll.

72.    On May 15, 2023, Debtor transferred $3,900.00 to KT Weaver for manual payroll at a higher than normal rate because he was purportedly working astronomical hours due to the cybersecurity event although, at this time, only minimal medical care was being performed and KT Weaver Construction was still working and being paid.

73.    On May 15, 2023, Debtor transferred $4,500.01[23] to KT Weaver Construction as a reimbursement for waste disposal, hauling, and other construction expenses.

74.    On May 19, 2023, Debtor transferred $4,500.00 to Liebl-Weaver but she could not identify the purpose of the payment which was not payroll.

75.    On May 19, 2023, Debtor transferred $51,320.15 to KT Weaver Construction as reimbursement for legal expenses as KT Weaver Construction paid the retainer for an attorney to work on Debtor's 401(k) issue arising from alleged employee wrongdoing and to reimburse for construction expenses.

76.    On May 30, 2023, Debtor transferred $13,772.89 to Liebl-Weaver for payroll.

77.    On May 30, 2023, Debtor transferred $4,521.16 to KT Weaver Construction for payroll (intended for KT Weaver) at an even higher compensation rate.

---

[23] Although the Final Pretrial Order indicated this transfer was in the amount of $4,500.00, the testimony and documentary evidence reflect the transfer was for $4,500.01. (Plaintiff Ex. 12, p. 67).

78.   On June 8, 2023, Debtor transferred $7,800.02[24] to KT Weaver for two payrolls

($3,900.01 x 2) possibly for February and March 2023.

79.   On June 8, 2023, Debtor transferred $24,950.00 to Liebl-Weaver for more than one

payroll as Debtor missed several payrolls in the spring of 2023 from being so focused on

patient care – she believes it was for February and March due to the cybersecurity event.

80.   On June 16, 2023, Debtor transferred $175,000.00[25] to KT Weaver Construction for labor

for extensive construction from the fall of 2022 to June of 2023 notwithstanding

KT Weaver Construction having been paid in excess of $210,000.00 during that time

frame while its principal, KT Weaver, worked full time for Debtor.[26]

**Debtor's Bankruptcy Filing and Oklahoma State Board of Medical Licensure**

81.   Debtor filed a voluntary chapter 7 bankruptcy petition on June 27, 2023 (the "Petition

Date"), commencing Case No. 23-11680 (the "Bankruptcy Case").  (Bankruptcy Case

Doc. 1).

---

[24] Although the Final Pretrial Order indicated this transfer occurred on June 6, 2023, in the amount of $7,800.00, the testimony and documentary evidence reflect the transfer was made June 8, 2023, for $7,800.02.  (Plaintiff Ex. 12, p. 75).

[25] The Court refers to the transfers identified in paragraphs 29-51 and 70-80 supra, as the "Transfers" when discussed in the aggregate.

[26] Defendants offered a summary of all construction projects performed by KT Weaver Construction during the relevant time frame for 960 hours (but not all inclusive), prepared by Liebl-Weaver and KT Weaver.  They attempted to corroborate the 960 hours with a limited number of undated pictures of a few "projects" which appear to encompass but a small fraction of the 960 hours claimed to have been performed by KT Weaver Construction for Debtor.  Moreover, several of the photographs were of projects at their house.  (Defendants Exs. 6, 7).

82.  On June 26, 2023, the Oklahoma State Board of Medical Licensure and Supervision (the "Medical Board") filed a Verified Complaint against Liebl-Weaver based on over 70 complaints against Liebl-Weaver in a one-month period.

83.  Per Liebl-Weaver, the reason for Debtor's bankruptcy filing was not bills mounting or debts being called but the fraudulent activity by employees in 2022 *(for which she admitted she has no evidence)* and the cybersecurity event in February 2023 *(for which no credible evidence was presented)*.

84.  Debtor filed its Summary of Schedules and Schedules in the Bankruptcy Case on July 11, 2023 (the "Schedules").  (Plaintiff Ex. 4).[27]  Liebl-Weaver assisted her counsel in preparation of the Schedules, reviewed them, and signed them as truthful and accurate.

85.  When it filed bankruptcy, Debtor scheduled total assets of $14,175,950.00 with one secured debt of $2.5 million and approximately $2.5 million in unsecured debt.  (Plaintiff Ex. 4, p. 28).

86.  In addition to listing the Real Property as being owned by Debtor, which it was not, the Schedules also identify $2,500,000.00 in accounts receivable for which there is absolutely no support based on the cybersecurity attack, and $40,000.00 in skincare products and $495,000.00 in spa equipment not owned by Debtor.  Debtor also identified $30,000,000.00 in causes of action for which she could not recall what it was for or how the number was reached.

---

[27] Debtor incorrectly scheduled the Real Property on its Schedule A filed on July 11, 2023, as real property it owned worth $9,500,000.00.  (Plaintiff Ex. 4, p. 5).  On October 13, 2023, over three and a half months after the Bankruptcy Case was filed, Debtor filed amended schedules reflecting it held only a leasehold interest in the Real Property (with no value).  (Bankruptcy Case Doc. 45, p. 6).

87.   On July 12, 2023, Trustee was appointed the chapter 7 trustee in the Bankruptcy Case. (Bankruptcy Case Doc. 13).

88.   On July 12, 2023, Debtor filed amended Summary of Schedules, Schedules, and Statement of Financial Affairs (the "Amended Schedules" and the "Amended SOFA"). (Bankruptcy Case Docs. 15 and 16).

89.   Liebl-Weaver authorized the filing of the Amended Schedules and the Amended SOFA. In the Amended SOFA, in response to question 4 regarding payments or other transfers to insiders within a year of the Petition Date, Debtor still answered "none."  Liebl-Weaver claims to have provided the information to her counsel and blamed the distance and the need to either get her accountant to print out documents or go to the library to review as a reason for the error.

90.   On October 13, 2023, Debtor filed another Amended Statement of Financial Affairs (the "Second Amended SOFA").  In response to question 4, Debtor identified eleven payments to Liebl-Weaver totaling $190,567.25 and three to KT Weaver totaling $23,300.03.  (Bankruptcy Case Doc. 46).  Liebl-Weaver was unable to identify why any of the 14 transfers were made and conceded further amendments may be necessary and were in fact "pending" with her counsel during the trial.[28]

91.   In the Second Amended SOFA, in response to question 3, Debtor identified 54 additional payments to creditors during the 90 days preceding the Petition Date including payments

---

[28] The Court directed Debtor's counsel in this adversary proceeding to advise Debtor's counsel in the Bankruptcy Case that known inaccuracies in Debtor's schedules and SOFA are continuing misrepresentations to the Court, Trustee, and creditors, and the "pending" amendments needed to be filed prior to the second day of trial.  A third amended Statement of Financial Affairs was filed ten days later on August 9, 2024 (the "Third Amended SOFA").  (Bankruptcy Case Doc. 70).

to Liebl-Weaver, KT Weaver, and KT Weaver Construction totaling $303,937.14. Two

payments to creditors labeled "unknown" during the preference period total $83,197.05.

Finally, two wire transfers from BancFirst to client code OMX47 (not identified by any

Defendant) total $133,658.16. (Bankruptcy Case Doc. 46, pp. 2-4 and 14-15).

92.    Liebl-Weaver voluntarily surrendered her medical license on November 16, 2023.

(Plaintiff Ex. 19). In the Order Accepting Voluntary Submittal to Jurisdiction,

Liebl-Weaver stipulated to the following (summarized):

> The bulk of the patient complaints centered on Liebl-Weaver not
> producing patient records when requested. As in this case, Liebl-Weaver
> claimed she and Debtor were the victims of cyber-attacks resulting in her
> inability to access client records. ***The Board contacted the company
> managing her medical records and they advised the records were not
> subject to any cybersecurity attack, were intact and available and
> accessible by Liebl-Weaver at any time and they would assist her in
> accessing them. Additionally, Liebl-Weaver made additional
> "unverified, troubling and incredible statements regarding further
> targeting of herself, her practice and her family," which could not be
> verified and gave rise to further concerns for the Medical Board.***

(See Plaintiff Ex. 19)

## Credibility

93.    The Court has no hesitation in stating it trusts nothing said by Defendants.[29]

Liebl-Weaver and KT Weaver had a litany of excuses for their complete inability to

---

[29] Linda Ankney also testified for Defendants. She worked for Debtor from August 2022 to July 2023. Ms. Ankney called and confirmed next day appointments and also helped KT Weaver daily at the Real Property, but she could not state whether he was an employee or not as he mostly did construction and maintenance. When she worked with him, he apparently paid her directly although we saw no bank records to that effect. While Ms. Ankney confirmed the medical records could not be accessed, she otherwise was not helpful in clarifying what actually transpired. Additionally, she is predisposed to Defendants as evidenced by the bar complaint against Trustee for failing to provide her a 2023 W2 – something which is not even Trustee's responsibility.

identify and show corroborating evidence for many, if not most, of their statements. Those excuses rest almost entirely on the cybersecurity event in February 2023 (with some claim KT Weaver's stolen identity and employee fraud and wrongdoing also played a role or were part of the cybersecurity attack).

94. Liebl-Weaver unequivocally testified the cybersecurity event was the reason Debtor had to file bankruptcy. Yet, the record contains no hard evidence the cybersecurity event actually took place rather than Debtor simply being denied access to files for some unknown reason.

95. Liebl-Weaver testified, after losing access to the medical records, her intention was to pick up and continue her medical practice once she regained access.[30] However, her actions speak louder than her words.

96. Debtor spent at least $100,000.00 in retainers for counsel in the fall of 2022 and the spring of 2023. However, these retainers were for specific matters allegedly unrelated to the cybersecurity event. In contrast, other than purchasing new computers, no evidence exists Defendants ever pursued regaining access to Debtor's medical records through legal channels.

97. Moreover, while Defendants engaged Great White Bison to assist in regaining access to the computers, such engagement was seven months after the cybersecurity event and three months after Liebl-Weaver closed Debtor and commenced the Bankruptcy Case. Great White Bison's engagement was also cursory at best – Great White Bison did not

---

[30] This was Liebl-Weaver's justification for the continued engagement and payment of KT Weaver Construction for construction and modification of the building on the Real Property owned by AAA Sisters notwithstanding the cybersecurity attack and minimal efforts to regain access to the medical records. The Court cannot reconcile the testimony with the actual facts.

handle Debtor's computers or phones, relying solely on screenshots and lists provided by Defendants to diagnose the possible problems.

98.   While Defendants claim the computers and, therefore, their records were inaccessible due to the cybersecurity event, Trustee testified Debtor's computers were not inaccessible but rather wiped clean, and this was not disputed by Liebl-Weaver or KT Weaver.

99.   Moreover, Defendants had paper records.  They delivered thirteen boxes of completely unorganized papers to Trustee yet gave no explanation why or how the cybersecurity event caused the paper records to be in utter shambles.  The Court is convinced Defendants intentionally disarranged their records to hinder an investigation and prevent discovery of what really happened.

100.  Liebl-Weaver testified about how Debtor's secured creditor and other creditors were satisfied after the bankruptcy petition was filed.  However, while laudable, this does not change the fact Defendants systematically drained cash from Debtor into their hands prior to the bankruptcy filing – preferring themselves to the legitimate creditors of Debtor.

101.  Moreover, per KT Weaver, KT Weaver Construction was entitled to keep all tools paid for by Debtor.  In the receipts (Defendants Ex. 5), the Court found at least 16 receipts containing itemized tools and equipment, none of which were delivered to Trustee or scheduled as assets of Debtor's estate.

102.  Liebl-Weaver is obviously well educated, testified clearly regarding the different business structures she used, and could give details specifically as to checks and work done (as she did freely with all questions she sensed were not problematic).  If she perceived a problem, however, she became evasive, despite repeated warnings.  When pushed, she

tended to give answers which were later contradicted by herself, KT Weaver, or the documentary evidence.

103.  Except when testifying, Liebl-Weaver appeared completely uninterested in the trial.

104.  KT Weaver, on the other hand, was attentive but overly confident.  The bulk of his testimony must be viewed as no more than speculation given his inability to answer direct questions by Trustee on day one of the trial but miraculously being able to clearly and confidently fill in the blanks on day two of the trial when questioned by his own counsel.

105.  KT Weaver also had no explanation for having no business records other than the receipts and tied his problems directly to Debtor's cybersecurity attack, suggesting it attacked the hard wiring of the Real Property but never explaining why that destroyed or jumbled his business records.

106.  The Court is also concerned with the mental stability of Liebl-Weaver and KT Weaver.  Both exhibited signs of paranoia not seen before by this Court in 14 years on the bench.  Their testimony covered house break-ins, cybersecurity events, big Pharma coming after Debtor and Liebl-Weaver for her research, employee fraud and wrongdoing, and tampering with internal closets at Debtor – all of which were only in evidence because of their testimony.  Nothing else in the record supports or corroborates the existence of these circumstances.

107.  Moreover, both Liebl-Weaver and KT Weaver in 2023 and 2024 had mental illness events purportedly related to medication.  Specifically, in 2023, KT Weaver became enraged after taking medication and was arrested and charged with domestic abuse.  In April 2024, Liebl-Weaver suffered from psychosis attributable to a reaction to medicine and was arrested based on the actions taken in response thereto.

24

108.   Taken as a whole, this Court has difficulty making any sense out of Defendants'

testimony and stories.  Something happened but this Court is confident what happened is

not what was explained by Defendants.  As frustrating as not knowing the why is, other

than bearing on the credibility of Liebl-Weaver and KT Weaver, it has no effect on the

outcome of Trustee's fraudulent transfer claims.

### APPLICABLE STATUTORY PROVISION

11 U.S.C. § 548(a)[31] provides in relevant part:

**(a)(1)** The trustee may avoid any transfer (including any transfer to or for the benefit of
an insider under an employment contract) of an interest of the debtor in property, or any
obligation (including any obligation to or for the benefit of an insider under an
employment contract) incurred by the debtor, that was made or incurred on or within 2
years before the date of the filing of the petition, if the debtor voluntarily or
involuntarily—

**(A)** made such transfer or incurred such obligation with actual intent to hinder, delay,
or defraud any entity to which the debtor was or became, on or after the date that such
transfer was made or such obligation was incurred, indebted; or

**(B)**        **(i)** received less than a reasonably equivalent value in exchange for such
transfer or obligation; and

**(ii)(I)** was insolvent on the date that such transfer was made or such
obligation was incurred, or became insolvent as a result of such transfer or
obligation;

**(II)** was engaged in business or a transaction, or was about to engage in
business or a transaction, for which any property remaining with the
debtor was an unreasonably small capital;

**(III)** intended to incur, or believed that the debtor would incur, debts that
would be beyond the debtor's ability to pay as such debts matured; or

---

[31] Unless otherwise indicated, hereafter all references to sections are to the Bankruptcy Code,
Title 11 of the United States Code.

**(IV)** made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

## CONCLUSIONS OF LAW

Fraudulent transfer law allows a creditor or trustee to avoid transfers made by a debtor which effectively depleted a debtor's assets. Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.), 435 B.R. 866, 875 (Bankr. S.D. N.Y. 2010) (citing 5 Collier on Bankruptcy ¶ 548.01 (16th ed. rev. 2010)). Section 548(a)(1)(A) allows a trustee to avoid transfers that are actually fraudulent, while Section 548(a)(1)(B) permits a trustee to avoid transfers that are constructively fraudulent. Herein, Trustee seeks to avoid 34 Transfers[32] as fraudulent transfers under both Sections 548(a)(1)(A) and (B). Trustee bears the burden of proving each element of his claims for avoiding the Transfers by a preponderance of the evidence. Weinman v. Walker (In re Adam Aircraft Indus., Inc.), 510 B.R. 342, 352 (10th Cir. BAP 2014), aff'd, 805 F.3d 888 (10th Cir. 2015) (citing Kaler v. Craig (In re Craig), 144 F.3d 587, 590 (8th Cir. 1998)). This includes demonstrating that the transferred assets had value to the estate. Yip v. Connedx Corp. (In re Gomez), 560 B.R. 866, 872 (Bankr. S.D. Fla. 2016) (citing Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.), 421 B.R. 251, 278-79 (Bankr. W.D. Tex. 2009)).

## I.    SECTION 548(a)(1)(A) – ACTUAL FRAUD

In order to sustain a cause of action under Section 548(a)(1)(A), a trustee must establish (i) a transfer of an interest of the debtor in property; (ii) made within two years before the debtor filed for bankruptcy; and (iii) done with "actual intent to hinder, delay, or defraud" a creditor. Manchester v. Sharpton (In re All Phase Roofing & Constr., LLC), No. 17-12414-SAH, 2020

---

[32] Specifically, Trustee seeks to avoid 11 transfers to Liebl-Weaver, five transfers to KT Weaver, and 18 transfers to KT Weaver Construction.

WL 374357, at *9 (Bankr. W.D. Okla. Jan. 17, 2020), aff'd, No. AP 17-01070, 2020 WL

5512500 (10th Cir. BAP Sept. 14, 2020) (citing Wagner v. McAnena (In re Vaughan Co.), 2014

WL 3889193, *2 (Bankr. D. N.M. 2014)); Montoya v. Ferguson (In re Motiva Performance

Eng'r, LLC), 2022 WL 6256964, at *10 (Bankr. D. N.M. 2022); Zubrod v. Keffer (In re Keffer),

307 B.R. 731, 2004 WL 632875, at *3 n.4 (10th Cir. BAP 2004).

### A.  TRANSFER MADE WITHIN TWO YEARS OF PETITION DATE

Under 11 U.S.C. § 101(54), the definition of transfer includes every mode of disposing

or parting with property or an interest in property.  Each of the Transfers identified by Trustee,

all of which are payments of money from Debtor, are transfers under Sections 101(54) and

548(a)(1)(A).

Moreover, each of the Transfers were made by Debtor to Defendants within a year of

Debtor's bankruptcy filing.

### B.  ACTUAL INTENT TO HINDER, DELAY, OR DEFRAUD CREDITORS

A debtor rarely admits he or she acted with fraudulent intent.  Zubrod v. Kelsey (In re

Kelsey), 270 B.R. 776, 782 (10th Cir. BAP 2001).  Therefore, a court may consider circumstantial

evidence establishing badges of fraud.  Taylor v. Rupp (In re Taylor), 133 F.3d 1336, 1338-39

(10th Cir. 1998).  Courts consider circumstantial evidence to determine whether certain badges of

fraud are present based on a fairly standard set of factors:

> "whether the transfer was to an insider; whether the debtor retained
> possession or control of the property after the transfer;
> concealment of the transfer; pending or threatened litigation
> against the debtor at the time of transfer; a transfer of substantially
> all of the debtor's assets; absconding by the debtor; removal or
> concealment of assets; reasonably equivalent value in exchange for
> the transfer; the debtor's insolvency at the time of the transfer; the
> proximity in time of the transfer to the incurrence of a substantial
> debt; and a transfer of substantial business assets to a lienor

followed by a subsequent transfer of such assets to an insider of the debtor."

Kelsey, 270 B.R. at 782 (citing Taylor, 133 F.3d at 1338-39); Motiva Performance, 2022

WL 6256954, at *10 (citing Taylor, 133 F.3d at 1338); Sharpton v. Manchester (All Phase

Roofing and Const., LLC), No. AP 17-01070, 2020 WL 5512500, at *5 (10th Cir. BAP Sept. 14,

2020) (citing Kelsey, 270 B.R. at 782); Lofstedt v. Kendall (In re Kendall), 491 B.R. 191, 2013

WL 1890660, at *5 (10th Cir. BAP 2013) (unpublished).

Every badge of fraud need not be present before a court may infer fraudulent intent, and

the badges do not have to be given the same weight.  Los Alamos Nat'l Bank v. Wreyford (In re

Wreyford), 505 B.R. 47, 59 (Bankr. D. N.M. 2014) (citing Emmett Valley Assocs. v. Woodfield

(In re Woodfield), 978 F.2d 516, 518 (9th Cir. 1992) (not all badges of fraud need be present in

order to infer fraudulent intent from the circumstances surrounding the transaction); Zanderman,

Inc. v. Sandoval (In re Sandoval), 153 F.3d 722, 1998 WL 497475, at *2 (4th Cir.1998).

Additionally, the badges of fraud are not exclusive.  Off. Comm. of Unsecured Creditors of

Fedders N. Am., Inc. v. Goldman Sachs Credit Partners (In re Fedders N. Am., Inc.), 405 B.R.

527, 545 (Bankr. D. Del. 2009).  The "[t]raditional badges of fraud are not the only indicators of

actual fraudulent intent.  Instead, '[t]hey are intended to be guideposts – as opposed to

ineluctable factors – in a court's analysis of the totality of the circumstances to determine

whether a transfer was made with actual fraudulent intent.'"  Manchester v. Sharpton (In re All

Phase Roofing and Const., LLC), 2020 WL 374357, at *15 (Bankr. W.D. Okla. 2020), aff'd

2020 WL 5512500 (10th Cir. BAP 2020) (citing Sher v. JPMorgan Chase Funding (In re TMST,

Inc.), 2019 WL 6883776, at *14 (Bankr. D. Md. Dec. 17, 2019) (quoting Furr v. TD Bank, N.A.

(In re Rollaguard Security, LLC), 591 B.R. 895, 918 (Bankr. S.D. Fla. 2018) (emphasis added))).

Generally, transfers to family members are subjected to particularly close scrutiny. The relationship of the parties in conjunction with other circumstances often provides compelling evidence of fraud.  Kelsey, 270 B.R. at 782 (citing Mather v. Clancy (In re Honey Creek Entertainment, Inc.), 246 B.R. 671, 686 (Bankr. E.D. Okla. 2000)).  The transfer of property to a spouse is a "classic" badge of fraud.  Chorches v. Chen (In re Jie Xiao), 608 B.R. 126, 157 (Bankr. D. Conn. 2019) (citing Salomon v. Kaiser (In re Kaiser), 722 F.2d 1574, 1583 (2d Cir. 1983)).  Additionally, asset shifting to different corporate entities wholly owned or closely assimilated with the debtor is also viewed as a badge of fraud.  Jie Xiao, 608 B.R. at 157 (citing Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 218, 61 S.Ct. 904, 85 L.Ed. 1293 (1941)).

### C.  ACTUAL INTENT EXISTS FOR SOME BUT NOT ALL OF THE TRANSFERS.

Application of the badges of fraud to the Transfers is a relatively easy task.

| Badge of Fraud | Present or Not |
| --- | --- |
| Transfer to an insider (and was transferee a family member) | Present for all Transfers.  Liebl-Weaver is the sole owner and member of Debtor.  For all intents and purposes, Liebl-Weaver is the principal of Debtor – all actions were done at her behest, direction, and design and for her or her husband's benefit.  Coan v. Chen (In re LXEng LLC), 607 B.R. 67, 92 (Bankr. D. Conn. 2019).  KT Weaver is Liebl-Weaver's husband and sole owner of KT Weaver Construction.  KT Weaver also worked for Debtor and paid significant invoices for Debtor when Liebl-Weaver forgot a checkbook.  The term "insider" includes a director of the debtor, an officer of the debtor, a person in control of the debtor, a partnership in which the debtor is a general partner, a general partner of the debtor, or a relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B); Parkinson Seed Farm, Inc. v. Arlo Weeks and Brookside, LLC (In re Parkinson Seed Farm, Inc.), 640 B.R. 218, 247 (Bankr. D. Idaho 2022).  KT Weaver Construction does not fit tidily into this definition; however, Section 101(31)(B) is not exclusive, and |

| | |
|---|---|
| | insiders include "those not listed in the statutory definition, but who have a 'sufficiently close relationship with the debtor that . . . conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor.'" Rubb v. United Sec. Bank (In re Kunz), 489 F.3d 1072, 1078-79 (10th Cir. 2007) (quoting Miller Avenue Professional & Promotional Serv. v. Brady (In re Enterprise Acquisition Partners), 319 B.R. 626, 631 (BAP 9th Cir.2004)).  The Court finds KT Weaver Construction did not deal with Debtor at arm's length as evidenced by the lax invoicing policy, undocumented work, and the fact KT Weaver, the sole owner, is Liebl-Weaver's husband. |
| Retention of possession or control of property transferred | Present for all Transfers.  It would be difficult to say Debtor did not retain some control over the property transferred because it all went to insiders. |
| Concealment of transfer | Present for all Transfers.  The Transfers were not concealed when made.  They were, however, absolutely concealed when the bankruptcy case was filed.  Debtor's first two statements of financial affairs reflected no Transfers, and the third statement of financial affairs reflects some, but not all, Transfers. Only after an admonition from the Court were all the Transfers properly reflected in the Third Amended SOFA. Furthermore, Defendants caused Debtor's paper records to be in disarray, and all Debtor's computers were wiped clean such that no business records from Debtor were available.  Similarly, other than the receipts, many of which were not identified thereon as being done for Debtor's benefit, KT Weaver and KT Weaver Construction had no records either. |
| Pending or threatened litigation against the debtor at the time of transfer | Not present. |
| Transfer of substantially all of the debtor's assets | Present for some Transfers.  This was not a factor when the Transfers began but certainly became a factor after October 2022.  At that point, something clearly happened to alter Debtor's operations and change its payment patterns.  Specifically, Debtor's payments to KT Weaver Construction significantly increased in amount versus its prior course of payments.  Nevertheless, Debtor stopped making rent payments to AAA Sisters in November 2022.  Debtor then did not pay Liebl-Weaver or KT Weaver their December 2022 payroll.  Notwithstanding these anomalies, Debtor paid significant sums to |

30

| | |
|---|---|
| | Liebl Weaver in late December 2022 and early January 2023 for management fees, loan repayment, and unused vacation, all without any corroborating evidence or documentary support. After the alleged cybersecurity attack, Debtor no longer billed for services, and monthly collections began to reduce. By the time the Bankruptcy Case was filed, Debtor had minimal assets and had been effectively stripped of all cash. |
| Absconding by the debtor or concealment of assets | Not Present. |
| Reasonably equivalent value in exchange for the transfer | Present for some Transfers. This factor is more muddled than the others. KT Weaver was hired as a full-time employee of Debtor at or near the time the Transfers were made. The Court has grave doubt Debtor received reasonably equivalent value for both his full-time employment and for the work KT Weaver Construction did for Debtor. The testimony reflected KT Weaver was in charge of payroll (but not bookkeeping) and repairs and maintenance as an employee of Debtor. However, KT Weaver Construction also did repairs and maintenance for Debtor and was generously compensated for this and for expenses incurred by KT Weaver Construction. The payments made to KT Weaver Construction dramatically increased in November 2022 and continued at high levels through Debtor's collapse. Additionally, KT Weaver Construction continued construction projects for Debtor after the cybersecurity event when little was being done to correct the effects thereof, making the demise of Debtor very likely if not inevitable. Finally, Debtor did not receive the value of the construction performed by KT Weaver Construction after the cybersecurity event (and for a great deal of the construction undertaken regardless of the time); instead, AAA Sisters, the owner of the Real Property reaped the benefit (total construction costs and expenses paid to KT Weaver Construction is $598,045.25). Additionally, Debtor paid KT Weaver Construction over $100,000.00 as reimbursement for attorney retainers. KT Weaver admits $50,000.00 was for his personal legal representation. The remainder was purportedly for an attorney's assistance with a Department of Labor issue; however, no evidence to support this was presented and the timing of the payment – well after the cybersecurity event – calls this assertion into question. |

| | |
|---|---|
| | Furthermore, for four of the transfers to Liebl-Weaver Debtor received no value. Liebl-Weaver testified Debtor paid her $28,000.00 on December 29, 2022, and $6,000.00 on February 15, 2023, for management fees owed to her by a research LLC. No explanation was given for why Debtor paid this cost on behalf of a third-party LLC, and it appears Debtor received no benefit. Liebl-Weaver also received $45,334.99 in unused vacation pay in early January 2023, at a time when she and KT Weaver had not received their December 2022 compensation and claimed she was unable to take vacation in 2022 based on employee fraud and the cybersecurity attack, neither of which occurred until late 2022. Additionally, Liebl-Weaver received $4,500.00 from Debtor on May 19, 2023, for which she could provide no explanation other than the amount was not payroll. Again, the Court must conclude Debtor received no benefit for this transfer. |
| The debtor's insolvency at the time of the transfer | Present for some Transfers. There was no proof Debtor was insolvent when the Transfers were made prior to the cybersecurity event. Once the cybersecurity event took place and no new billings could be prepared and collected, insolvency became an issue. Debtor's bank account balance decreased dramatically with minimal additions between the event and the bankruptcy filing. |
| A transfer of substantial business assets to a lien or followed by a subsequent transfer of such assets to an insider of the debtor | Not present. |
| The proximity in time of the transfer to the incurrence of a substantial debt | Not present. |
| Asset shifting to different corporate entities wholly owned or closely assimilated with the debtor | Present for all Transfers to KT Weaver Construction for improvements to the building in which Debtor operated, but did not own. Instead, AAA Sisters, an entity nearly entirely owned by Liebl-Weaver, reaped the benefits of these improvements when it sold the property. |

While not every badge of fraud is present, a significant number are present. "One badge of fraud can 'spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud.'" LXEng LLC, 607 B.R. at 92 (citing Hirsch v. Steinberg

(In re Colonial Realty Co.), 226 B.R. 513, 522 (Banrk. D. Conn. 1998) (citing Acequia v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 806 (9th Cir. 1994))).  Moreover, and perhaps of greatest importance to this Court's analysis:  (i) the Transfers after October 2022 excessively benefitted Liebl-Weaver, her husband KT Weaver, and his wholly owned KT Weaver Construction; and (ii) Liebl-Weaver, KT Weaver, and KT Weaver Construction drained the cash assets, the only significant asset of Debtor, immediately prior to the filing of the Bankruptcy Case.  Additionally, while payments to KT Weaver Construction were increasing late 2022 and 2023, Debtor did not issue payroll checks to Liebl-Weaver and KT Weaver in December 2022.  After the cybersecurity event and only when it was apparent the end was near, Debtor started issuing payroll to Liebl-Weaver and KT Weaver again and "catching up" past payments.[33]  Moreover, Debtor began paying KT Weaver at a higher rate because he was putting in so much extra work at a time when Debtor could only see patients with chronic care needs because it had no access to the medical records.  This reeks of favoritism and a systemic effort to strip the cash for their benefit rather than the creditors' benefit.[34]

Additionally, Debtor paid a $50,000.00 retainer to Box & Box to handle communications and discussions with the FBI regarding KT Weaver's stolen identity.  While Liebl-Weaver attempted to associate KT Weaver's stolen identity with the cybersecurity event, her timing was markedly off.  When Box & Box was retained in fall of 2022, Debtor had suffered no

---

[33] Debtor's bank statements reflect Liebl-Weaver received no payments attributable to payroll from December 28, 2022, until April 3, 2023, and after this payment payroll stopped again until May 30, 2024.  KT Weaver received no payroll payments from December 23, 2022, until May 15, 2023.  (Plaintiff Ex. 12).

[34] Debtor had total scheduled debts on the petition date of $5,099,188.30, with that amount amended to be $2,317,425.43.  (Bankruptcy Case Docs. 9, 69).

cybersecurity event, rather only KT Weaver's identity had been stolen. Nevertheless, Debtor

reimbursed KT Weaver Construction $75,000.00, in part to pay the Box & Box retainer, which

benefitted KT Weaver exclusively.[35]  Neither Liebl-Weaver nor KT Weaver even attempted to

justify Debtor's payment of the retainer other than the failed attempts to link it to the yet-to-

occur cybersecurity event.  No legitimate reason existed for Debtor to reimburse KT Weaver for

this amount especially given the fact Debtor had paid KT Weaver Construction over $100,000.00

in November alone.  As the transfer was to reimburse an insider for his personal legal expenses,

it is a fraudulent transfer.[36]  11 U.S.C. § 101(31)(B); Parkinson Seed Farm, Inc., 640 B.R. at 247.

That the $75,000.00 payment (which includes the $50,000.00 reimbursement to

KT Weaver) took place on the heels of the amounts being paid to KT Weaver Construction

exponentially increasing beginning in October 2022 implies fraud as well.  Prior payments to

KT Weaver Construction were generally under $10,000.00.  Beginning with the October 21,

2022 payment which was $17,230.00, they dramatically increased.  Debtor paid KT Weaver

Construction $9,320.00 on November 7, 2022.  Just one week later, Debtor paid another

$42,048.22 and $60,031.00 to KT Weaver Construction, and a few weeks after that paid another

$75,000.00, and nine days later paid $37,225.00, all while KT Weaver was supposed to be

---

[35]The justification for the remaining $25,000.00 of this payment to KT Weaver was typically anything but clear and leads the Court to conclude it also was without benefit to Debtor.

[36]Debtor concealed this transfer on its bankruptcy schedules; in fact, Debtor did not properly disclose the transfer until *after* the trial in this matter when Debtor filed its Third Amended SOFA on the Court's stern direction.  The parties also attempted to conceal the purpose of this transfer when questioned about it at trial.  Liebl-Weaver claimed the $50,000.00 to Irven Box was for investigation of the cyberfraud which had not yet occurred.  KT Weaver testified the payment was for construction expenses such as HVAC and lighting, and a reimbursement for medication he purchased for Debtor.  Eventually, KT Weaver admitted he was reimbursed for personal legal expenses.

working full time for Debtor as an individual. Notably, no evidence was presented showing KT Weaver Construction employees performed work at the Real Property. Debtor paid another $75,000.00 to KT Weaver Construction on February 15, 2023, to reimburse it for purchasing medication for Debtor (which was supported by evidentiary documentation) and two days later paid an additional $6,377.49. Then, nothing was paid until mid-May 2023 during Debtor's inevitable slide into bankruptcy. The substantial increase in payments to KT Weaver Construction beginning in November 2022 is clearly the first step in Defendants' efforts to strip the cash out of Debtor.

Based on the totality of the circumstances and badges of fraud discussed above, the Court finds Debtor had actual intent to hinder, delay, or defraud its creditors to their detriment and to the benefit of Defendants as to $623,347.82 of the Transfers ($144,024.77 to Liebl-Weaver, $23,300.02 to KT Weaver, and $456,023.03 to KT Weaver Construction). As to Liebl-Weaver and KT Weaver, this amount comprises all Transfers made after they stopped payroll on December 28, 2022, as this is one of the first indications to the Court Defendants were manipulating Debtor's financials, particularly given the unprecedented payments to Liebl-Weaver and KT Weaver outside of payroll beginning at the same time. However, there was no evidence Defendants failed to earn payroll prior to that date. As to KT Weaver Construction, this amount reflects all Transfers after November 16, 2022, excluding only the February 15, 2023 reimbursement of $75,000.00 for medication which was purchased for and used by Debtor. At this point, Debtor began pouring money into KT Weaver Construction, and Debtor's collapse became imminent. It is clear to the Court for these Transfers, Debtor had actual intent to hinder, delay, or defraud its creditors.

| Fraudulent Transfers Avoidable under Section 548(a)(1)(A) | | | | | |
|---|---|---|---|---|---|
| **Liebl-Weaver** | | **KT Weaver** | | **KT Weaver Construction** | |
| 12/29/2022 | $28,000.00 | 3/17/2023 | $11,600.00 | 11/16/2022 | $42,048.22 |
| 1/3/2023 | $45,334.99 | 5/15/2023 | $3,900.00 | 11/16/2022 | $60,031.00 |
| 1/25/2023 | $7,744.00 | 6/5/2023 | $7,800.02 | 12/5/2022 | $75,000.00 |
| 2/16/2023 | $6,000.00 | **TOTAL** | **$23,300.02** | 12/14/2022 | $37,225.00 |
| 4/3/2023 | $13,722.89 | | | 2/17/2023 | $6,377.49 |
| 5/19/2023 | $4,500.00 | | | 5/15/2023 | $4,500.01 |
| 5/30/2023 | $13,772.89 | | | 5/19/2023 | $51,320.15 |
| 6/8/2023 | $24,950.00 | | | 5/30/2023 | $4,521.16 |
| **TOTAL** | **$144,024.77** | | | 6/16/2023 | $175,000.00 |
| | | | | **TOTAL** | **$456,023.03** |

Therefore, all elements of Section 548(a)(1)(A) have been satisfied as to the above

Transfers and the total amount of avoidable Transfers is $623,347.82.

## II.    SECTION 548(a)(1)(B) – CONSTRUCTIVE FRAUD

A trustee's cause of action under Section 548(a)(1)(B) is often referred to as constructive

fraud because it omits any element of intent.  To sustain a cause of action for a constructively

fraudulent transfer, a trustee must first establish there was a transfer of a debtor's property

interest within two years prior to the petition date, and then show the debtor received less than

reasonably equivalent value in exchange for the transfer.  Additionally, the trustee must

demonstrate either (a) the transfer was made when the debtor was insolvent or the debtor became

insolvent as a result of such transfer, (b) the debtor was engaged or about to become engaged in a

business or a transaction for which its remaining property represented an unreasonably small

capital, (c) the debtor intended to incur debts beyond its ability to repay them as they matured, or

(d) the debtor made the transfer to or for the benefit of an insider, under an employment contract

and not in the ordinary course of business. 11 U.S.C. § 548(a)(1)(B)(ii); Ryan v. Montoya

(In re Gonzales), 2011 WL 2619609, at *2 (Bankr. D. N.M. 2011).  This second requirement is

sometimes referred to as the "insolvency requirement," because a trustee must prove the debtor

was insolvent at the time of the transfer or otherwise in a "fragile financial condition."

36

Manchester v. Sharpton (In re All Phase Roofing & Constr., LLC), No. 17-12414-SAH, 2020 WL

374357, at *9 (Bankr. W.D. Okla. Jan. 17, 2020), aff'd, No. AP 17-01070, 2020 WL 5512500

(10th Cir. BAP Sept. 14, 2020) (citing Kendall, 491 B.R. 191).  Thus, the constructive fraud

provision of Section 548(a)(1)(B) applies to transfers by insolvent debtors.  BFP v. Resol. Tr.

Corp., 511 U.S. 531, 535, 114 S. Ct. 1757, 1760, 128 L. Ed. 2d 556 (1994).

### A. TRANSFERS WITHIN TWO YEARS OF PETITION DATE.

The Court has previously found all of the Transfers qualify as transfers under Sections

101(54) and 548(a) and all Transfers were made by Debtor to Defendants within a year of

Debtor's bankruptcy filing.

### B. INSOLVENCY.

The next step is whether Debtor was insolvent at the time each of the Transfers were

made.  Section 101(32) defines "insolvent," in relevant part, as the "financial condition such that

the sum of such entity's debts is greater than all of such entity's property, as a fair valuation."

For purposes of Section 548(a)(1)(B)(ii)(I), "insolvency is determined using a 'balance sheet

test,' meaning the debtor's liabilities exceed its assets at fair valuation." Adam Aircraft Indus.,

Inc., 510 B.R. at 352-53 (citing Sherman v. Rose (In re Sherman), No. 00-8052, 2001 WL

997946, at *2 (10th Cir. Aug. 31, 2001)).  See also Sheffield Steel Corp. v. HMK Enter., Inc.

(In re Sheffield Steel Corp.), 320 B.R. 423, 442-43 (Bankr. N.D. Okla. 2004).

Trustee failed to satisfy his burden of proving Debor was insolvent when each of the

Transfers were made for most of the Transfers (but not all).  Debtor's books and records were

such a mess they were not a source to establish insolvency on the date of each Transfer.

In his Proposed Findings of Fact and Conclusions of Law, Trustee argues balance sheet

insolvency based on Debtor's Schedules.  (See Doc. 56, pp. 6, 19, 22).  The Court agrees Debtor

was insolvent on the Petition Date; however, the Transfers did not occur on the Petition Date. Rather, the Transfers occurred from July 2022 to June 2023, and Trustee was required to prove Debtor was insolvent at the time of each Transfer.  Manchester v. Sharpton (In re All Phase Roofing & Constr., LLC), No. 17-12414-SAH, 2020 WL 374357, at *9 (Bankr. W.D. Okla. Jan. 17, 2020), aff'd, No. AP 17-01070, 2020 WL 5512500 (10th Cir. BAP Sept. 14, 2020).

However, where a debtor's financial condition cannot be determined as of the transfer date, courts can use the principle of retrojection to fill in the gaps.  Murphy v. Nunes (In re Terrific Seafoods, Inc.), 197 B.R. 724, 731 (Bankr.D.Mass. 1996) (citing Hassan v. Middlesex County National Bank (In re Mystic Pipe & Supply Corp.), 333 F.2d 838, 840 (1st Cir. 1964), cert. denied 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964)).  Under retrojection, if a debtor is shown to be insolvent on the petition date, and it is established the debtor's financial condition did not change between the subject transfer and the petition date, insolvency at the prior time may be inferred from the actual insolvency at the later petition date.  Gordon v. Vilela (In re Vilela), 2014 WL 5812340, at *4 (Bankr. D. N.H. 2014) (citing Braunstein v. Crawford (In re Crawford), 454 B.R. 262, 273 (Bankr.D.Mass.2011) (quoting Foley v. Briden (In re Arrowhead Gardens, Inc.), 32 B.R. 296, 301 (Bankr. D. Mass.1983))).  "A retrojection analysis begins with a debtor's financial condition at a certain point in time (typically the petition date) and extrapolates back in time in an attempt to show that the debtor must have been insolvent at some earlier relevant time (e.g., the date of an alleged fraudulent transfer)."  Daneman v. Stanley (In re Stanley), 384 B.R. 788, 807 (Bankr. S.D. Ohio 2008).

When retrojection is used to establish insolvency, the trustee must show the "absence of any substantial or radical changes in the assets or liabilities of the bankrupt between the retrojection dates."  Stanley, 56 B.R. at 807 (citing Parlon v. Claiborne (In re Kaylor Equip. &

Rental, Inc.), 56 B.R. 58, 62 (Bankr.E.D.Tenn. 1985) ("In proving the insolvency of the debtor, a trustee may meet his burden of proof by showing that the debtor was insolvent at a reasonable time subsequent to the date of the alleged transfer, accompanied by proof that no substantial change in the debtor's financial condition occurred during the interval.").  There is no time limitation on application of retrojection.  Retrojection can be used to go back days, weeks, or even several months in time.  Stanley, 384 B.R. at 807-08 (citing Bartl v. Twardy (In re Claxton), 32 B.R. 224, 232 (Bankr. E.D. Va. 1983)).[37]

Here, Debtor was insolvent on the Petition Date – perhaps not on its originally filed Schedules or the first or second amended versions thereof.  However, the final third amended schedules filed on August 9, 2024, (shortly after conclusion of the trial in this matter after a specific directive from the Court) starkly reveal the extent of Debtor's insolvency on the Petition Date, with assets of only $124,950.00[38] and liabilities of $2,317,425.43.  (Bankruptcy Case Doc. 69, p. 29).  This state of assets exceeding liabilities does not appear to have changed during the period between the end of March 2023 and the Petition Date.  There was no evidence Debtor either acquired or disposed of assets, and the bank account balance was significantly less than

---

[37] Stanley provides the following examples of time frames used in retrojection:  Briden v. Foley, 776 F.2d 379, 382 (1st Cir.1985) (29 days); Misty Mgmt. Corp. v. Lockwood, 539 F.2d 1205, 1213 (9th Cir. 1976) (six months); Snider v. England, 374 F.2d 717, 719 (9th Cir. 1967) (two months); Kovacs v. Berger (In re Berger), No. 05-3214, 2007 WL 2462646, at *7 (Bankr. N.D. Ohio Aug. 27, 2007) (17 days); Hopkins v. D.L. Evans Bank (In re Fox Bean Co.), 287 B.R. 270, 282 (Bankr. D. Idaho 2002) (three months), aff'd, 144 F. App'x. 697 (9th Cir. 2005); Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.), 348 B.R. 234, 276 (Bankr. D. Del.2005) (24 days), aff'd, 2007 WL 1232185 (D. Del. Apr. 26, 2007); Silagy v. Gagnon (In re Gabor), 280 B.R. 149, 160 (Bankr. N.D. Ohio 2002) (six months); Monus v. Antonucci (In re Monus), 1995 WL 469694, at *12 (Bankr. N.D. Ohio 1995) (22 days); Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.), 91 B.R. 430, 437 (Bankr. N.D. Ohio 1988) (16 days).

[38] This figure is compared to the asset value originally scheduled of $14,175,950.00 which obviously was a gross inaccuracy.  (Bankruptcy Case Doc. 9, p. 28).

had been the norm. However, Trustee seeks to avoid the Fraudulent Transfers made by Debtor to Defendants during the entire year preceding its bankruptcy filing – a year for which the Court has only scarce evidence of Debtor's financial condition.

Given Debtor's inability to access its computers, coupled with the disorganized mess of its paper files, the Court has little on which to base a solvency analysis; however, Debtor's BancFirst bank statements beginning in December 2022 do offer some insight. From December 2022 to mid-March 2023, Debtor's bank account reflected a pattern of relatively substantial balances which, if depleted, were quickly replenished through regular deposits.[39] That pattern changed in March 2023, and the balance substantially diminished during April and half of May and then is depleted in June before the Petition Date.

Though the Court does not accept the cybersecurity event as an actual cybersecurity attack on Debtor's computer and phone systems, the Court does believe the date establishes a demarcation in Debtor's financial condition from otherwise healthy to fragile and then insolvent as a result of Defendants' actions. Beginning in late February 2023, Debtor ceased seeing patients for diagnosis and follow-up care but only saw patients for routine maintenance care (i.e. allergy shots) and was unable to bill for such treatment as it could not access its medical records or computers. While the effects were not immediate, they were observable by the end of

---

[39] Debtor's bank account balances from December 2022 to the Petition Date are as follows:

| | |
|---|---|
| November 30, 2022 | $451,321.62 |
| December 30, 2022 | $188,617.82 |
| January 31, 2023 | $186,936.80 |
| February 28, 2023 | $408,489.20 |
| March 31, 2023 | $33,899.37 |
| April 28, 2023 | $84,753.11 |
| May 31, 2023 | $21,179.97 |
| June 30, 2023 | $6,474.33 |

March 2023, through the Petition Date as Debtor's bank balance was substantially lower than prior to the February 2023 event and was no longer being replenished at the same rate.[40]  The decline in Debtor's financial health and certainly its liquidity was slowed by Debtor's choice not to pay Defendants during December 2022 through most of March 2023 only to commence the payments at the very end of April and continuing until the Petition Date.  At some point, the receivables existing in late February 2023 were collected but not replaced so no new collections and corresponding deposits increased or even maintained the balance.  Additionally, because Debtor did not bill for treatment after February 2023, Debtor's accounts receivables would also necessarily decrease as previous receivables were paid and no new ones were created.

Based on this, when coupled with the debt balances on the Petition Date and the deficiency of assets to satisfy the debt obligations and KT Weaver Construction's unending construction on the Real Property owned by AAA Sisters, the Court finds Debtor was insolvent or financially fragile after mid-March 2023.

### C.  REASONABLY EQUIVALENT VALUE.

The final step is to determine whether Debtor received reasonably equivalent value for each of the Transfers made after mid-March 2023.  Reasonably equivalent value is not defined in the Bankruptcy Code, but is intended "to protect creditors against the depletion of a bankruptcy estate."  Riley v. Countrywide Home Loans, Inc. (In re Duplication Mgmt., Inc.), 501 B.R. 462, 486 (Bankr. D. Mass. 2013) (quoting Senior Transeastern Lenders v. Official Committee of

---

[40]Generally, Debtor had well in excess of $100,000.00 in its bank account (and if it dropped below, it was quickly replenished by collection of receivables).  This pattern ended in late March 2023 for the most part.  For example, Debtor paid Liebl-Weaver $13,722.89 on March 31, 2023, which when it cleared the bank, left Debtor with a cash balance of $55,971.06.  The greatest overall reductions in Debtor's bank account occurred in May and June 2023, leaving a balance of $14,231.17 on June 16, 2023.  (See Plaintiff Exs. 12 and 14).

Unsecured Creditors (In re TOUSA Inc.), 680 F.3d 1298, 1311 (11th Cir. 2012)); see also

Stillwater Nat'l Bank v. Kirtley (In re Solomon), 299 B.R. 626, 633 (10th Cir. BAP 2003)

("However, § 548 neither defines 'reasonably equivalent value' nor offers guidance for

determining whether REV exists.").  "Reasonably equivalent value" is not susceptible to simple

formulation.  FNF Security Acquisition, Inc. v. Mercury Co., Inc. (In re Mercury Co., Inc.),

527 B.R. 438, 447 (D. Colo. 2015) (quoting Sharp v. Chase Manhattan Bank USA, N.A., (In re

Comm'l Fin. Servs.), 350 B.R. 559, 578 (Bankr. N.D. Okla. 2005) (internal quotation marks

omitted)).  Whether a transfer is made in exchange for reasonably equivalent value under Section

548(a)(1)(B) is largely a question of fact, as to which the trier of fact has considerable latitude.

Clark v. Security Pacific Bus. Credit, Inc. (In re Wes Dor, Inc.), 996 F.2d 237, 242 (10th Cir.

1993) (citing 4 Collier on Bankruptcy ¶ 548.09, at 548-112 (15th ed. 1993)).

       Courts conduct a two-prong analysis "to determine whether a debtor has received

reasonably equivalent value in exchange for its transfer of an interest in its property to another."

Gomez, 560 B.R. at 873 (quoting 8699 Biscayne, LLC v. Indigo Real Estate LLC (In re 8699

Biscayne, LLC), 2012 Bankr. LEXIS 1244 at *13 (Bankr. S.D. Fla. 2012)).  First, courts

question whether the debtor received value; second, courts question whether that value was

reasonably equivalent to what the debtor gave up.  Goshen Mortg., LLC v. Altier (In re Altier),

2017 WL 1011416, *3 (Bankr. M.D. Fla. 2017).  See also LTF Real Estate Co., Inc. v. Expert

S. Tulsa, LLC (In re Expert S. Tulsa, LLC, 522 B.R. 634, 652 (10th Cir. BAP 2014) ("An

examination into reasonably equivalent value includes three inquiries: (1) whether value was

given; (2) if value was given, whether it was given in exchange for the transfer; and (3) whether

what was transferred was reasonably equivalent to what was received.").  As stated by the Tenth

Circuit Court of Appeals, "[a] determination of whether a transfer involved the exchange of

reasonably equivalent value requires consideration of whether or not the transferor's unsecured creditors were better off before or after the transfer." Rajala v. Gardner, 661 F. App'x 512, 516-17 (10th Cir. 2016) (unpublished) (quoting Expert S. Tulsa v. Cornerstone Creek Partners, LLC (In re Expert S. Tulsa, LLC), 534 B.R. 400, 413 (10th Cir. BAP 2015), aff'd, 842 F.3d 1293 (10th Cir. 2016)).

The Court must then address each of the Transfers made to Defendants after mid-March 2023 to the Petition Date to determine if reasonably equivalent value was received by Debtor in exchange for those transfers. Unfortunately for Trustee, he generally failed to establish Debtor received less than reasonably equivalent value with four exceptions as the other payments were payroll,[41] i.e. compensation for services performed as employees of Debtor.[42]

The first questionable payment during Debtor's insolvency is the $4,500.01 transfer to KT Weaver Construction on May 15, 2023. Liebl-Weaver testified the amount was for construction expenses but could not recall for what specifically. KT Weaver testified the amount was for waste disposal and hauling expenses, however, provided no receipts or any documentation in support. To the extent the transfer was a reimbursement for construction costs, Debtor received little to no value from such construction given the closure and subsequent sale

---

[41] All payroll paid to Liebl-Weaver and KT Weaver after the end of March 2023 appears to be classic preferences based on the testimony of Liebl-Weaver and KT Weaver that such payments were "catch-up payments from payrolls missed in February and March." Interestingly, no payroll was paid in December 2022 and January 2023 but no explanation was given for why they were missed although they are clear harbingers of things to come.

[42] No evidence suggests either Liebl-Weaver or KT Weaver were not working during this time. The Court does not agree with Trustee that the absence of written employment contracts or other evidence of time worked by them for Debtor establishes no reasonably equivalent value for the payments as the only evidence, i.e. the testimonial evidence of Liebl-Weaver, KT Weaver, and Ms. Ankney and the timing of the complaints made to the Medical Board, shows Debtor was open and operating with both Liebl-Weaver and KT Weaver present. However, as discussed in Part I, supra, the sudden change in payroll practices at the end of December indicates fraud.

of the Real Property by AAA Sisters (with no distribution made to Debtor). The Court cannot, therefore, find Debtor received reasonably equivalent value for this transfer.

Second, Debtor paid Liebl-Weaver $4,500.00 on May 19, 2023, which, based on the record, appears to be a gratuitous payment as Liebl-Weaver had no recollection of the nature of or reason for the payment. Liebl-Weaver could state only that it was a reimbursement, but her vague recollection is too speculative to establish reasonably equivalent value was exchanged.

Third, Debtor paid KT Weaver Construction $51,320.15 on May 19, 2023, for a law firm retainer for Debtor and reimbursement for something. Again, this testimony does not provide any legitimate consideration for the transfer much less documentation reflecting the circumstances requiring the payment of a $50,000.00 retainer and any value received by Debtor, who was clearly financially floundering at this point.

Fourth, Debtor paid KT Weaver Construction $175,000.00 on June 16, 2023, a mere 11 days before the Petition Date. Without documentation, Liebl-Weaver and KT Weaver asserted this was for construction work performed in the fall of 2022 through the spring of 2023. While KT Weaver suggested it was for ceiling work, hard wire connections, paint, toilets, faucets, etc., these items were also covered by the $390,848.03 already paid to KT Weaver Construction in the fall of 2022 through the spring of 2023, all without any invoices or corroborating documentation legitimizing the monies paid, and all while KT Weaver was also receiving a $72,800.00 annual salary as Debtor's full time employee. To the extent it was for work after the cybersecurity event, the Court cannot fathom why so much work was done when Debtor was not able to operate normally, with the situation growing worse day by day until Debtor closed its doors. Again, Debtor received little to no value from such construction as

44

AAA Sisters (and, ultimately, Liebl-Weaver and her daughters) reaped the benefit of the improvements to the Real Property when it was sold.

In conclusion, the Court finds (i) the $4,500.01 May 15, 2023, transfer to KT Construction, (ii) the $4,500.00 May 19, 2023, transfer to Liebl-Weaver, (iii) the $51,320.15 May 19, 2023, transfer to KT Weaver Construction, and (iv) the June 16, 2023, transfer of $175,000.00 to KT Weaver Construction are fraudulent transfers avoidable pursuant to Section 548(a)(1)(B).

## III.    __CONSPIRACY__.

Trustee seeks to hold Liebl-Weaver and KT Weaver liable as co-conspirators for their effort to drain Debtor of its remaining cash shortly before the bankruptcy filing.  In the Complaint, Trustee seeks to recover $819,467.59 from Liebl-Weaver and KT Weaver as a result of their civil conspiracy.  In Oklahoma, a "civil conspiracy consists of a combination of two or more persons to do an unlawful act or to do a lawful act by unlawful means. . . .  In order to be liable the conspirators must pursue an independently unlawful purpose or use an independently unlawful means."  AKC ex rel. Carroll v. Lawton Indep. Sch. Dist. No. 8, 9 F. Supp. 3d 1240, 1244-45 (W.D. Okla. 2014) (citing Gaylord Entm't Co. v. Thompson, 958 P.2d 128, 148 (Okla. 1998)).  A "civil conspiracy itself does not create liability." Brock v. Thompson, 948 P.2d 279, 294 (Okla. 1997).

However, a number of bankruptcy courts have held a plaintiff cannot recover damages for a conspiracy to commit a fraudulent transfer.  Schlossberg v. Madeoy (In re Madeoy), 576 B.R. 484, 496-97 (Bankr. D. Md. 2017) (citing Indus. Enters. of Am., Inc. v. Mazzuto (In re Pitt Penn Holding Co.), 484 B.R. 25, 48 (Bankr. D. Del. 2012) ("Bankruptcy courts do not recognize claims for damages for conspiracy to commit a fraudulent transfer."); Hyundai

_Translead, Inc. ex rel. Estate of Trailer Source, Inc. v. Jackson Truck & Trailer Repair Inc._, 419 B.R. 749, 761 (M.D. Tenn. 2009) ("[T]he authorities are [ ] clear that there is no such thing as liability for aiding and abetting a fraudulent conveyance or conspiracy to commit a fraudulent transfer as a matter of federal law under the Code.") (quoting _Fedders N. Am., Inc._, 405 B.R. at 549)). Consequently, a trustee's remedies for a fraudulent transfer claim are limited to remedies provided in Section 550. _Madeoy_, 576 B.R. at 497. Section 550 "only allows the trustee to recover up to the amount of the transfer from a transferee, or a party for whose benefit the transfer was made." _Madeoy_, 576 B.R. at 497 (citing _Fedders N. Am., Inc._, 405 B.R. at 548 (citing _Sherman v. FSC Realty LLC_ (_In re Brentwood Lexford Partners, LLC_), 292 B.R. 255, 275 (Bankr. N.D. Tex. 2003))); _Schlossberg v. Abell_ (_In re Abell_), 549 B.R. 631, 667 (Bankr. D. Md. 2016)). "Allowing a trustee to recover more than the amount of the transfer would 'lead to a result that expands the remedies [for a fraudulent transfer] beyond § 550.'" _Madeoy_, 576 B.R. at 497 (citing _Brentwood Lexford Partners_, 292 B.R. at 275). "[T]he authorities are . . . clear that there is no such thing as liability for aiding and abetting a fraudulent conveyance or conspiracy to commit a fraudulent transfer as a matter of federal law under the Code." _Hyundai Translead, Inc. ex rel. Est. of Trailer Source, Inc. v. Jackson Truck & Trailer Repair Inc._, 419 B.R. 749, 761 (M.D. Tenn. 2009) (citing _Brentwood Lexford Partners_, 292 B.R. at 275)).

As a result, judgment will be entered in favor of Defendants Liebl-Weaver and KT Weaver on Trustee's civil conspiracy claim.

## IV.    __EMBEZZLEMENT__.

Trustee's final claim is for embezzlement against Liebl-Weaver for $819,467.59 transferred out of Debtor. However, there is no federal embezzlement claim. _Calvin v. Oklahoma_, No. CIV-16-1225-HE, 2017 WL 1024339, at *2 n.5 (W.D Okla. Mar. 15, 2017).

While Oklahoma has codified a criminal statute addressing embezzlement, see Okla. Stat. tit. 21, § 1451, the state does not recognize embezzlement as a civil cause of action.  See Morrison ex rel. Haar Family Trust v. Anadarko Petroleum Corp., No. CIV-10-135-M, 2010 WL 2721397, at *3 (W.D. Okla. July 6, 2010); McKnight v. Linn Operating, Inc., No. CIV-10-30-R, 2010 WL 9039794, at *4 (W.D. Okla. Apr. 1, 2010); Nixon v. Berryhill, No. CIV-17-1264-CG, 2018 WL 2946424, at *4 (W.D. Okla. Mar. 26, 2018), report and recommendation adopted, No. CIV-17-1264-CG, 2018 WL 2946402 (W.D. Okla. June 12, 2018).  As "Oklahoma does not recognize a cause of action for civil embezzlement . . . under Oklahoma law, this Court will not create one." Morrison ex rel Haar Family Trust v. Anadarko Petroleum Corp., 2010 WL 2721397, at *3 (W.D. Okla. 2010).

Accordingly, judgment will be entered in favor of Defendant Liebl-Weaver and KT Weaver and against Trustee for his embezzlement claim.

## CONCLUSION

For the reasons set forth above, judgment will be entered as follows:

1.  Partial judgment in favor of Trustee and against Liebl-Weaver on Trustee's claim to avoid the Transfers under Section 548(a)(1)(A) for those Transfers made after December 28, 2022, in the amount of $144,024.77, of that amount $4,500.00 is also avoidable under Section 548(a)(1)(B);

2.  Partial judgment in favor of Trustee and against KT Weaver on Trustee's claim to avoid the Transfers under Section 548(a)(1)(A) for those Transfers made after December 28, 2022, in the amount of $23,300.02;

3.  Partial judgment in favor of Trustee and against KT Weaver Construction on Trustee's claim to avoid the Transfers under Section 548(a)(1)(A) for those Transfers made on or

after November 16, 2022, in the amount of $456,023.03, of that amount $230,820.16 is also avoidable under Section 548(a)(1)(B);

4.    Judgment in favor of Defendants Liebl-Weaver and KT Weaver and against Trustee for Trustee's civil conspiracy claim; and

5.    Judgment in favor of Defendants Liebl-Weaver and KT Weaver and against Trustee for Trustee's embezzlement claim.

A separate judgment will be entered.

IT IS SO ORDERED.

# # #